National Gypsum Company v. Commissioner.
National Gypsum Co. v. Commissioner
Docket Nos. 107659, 108714.
United States Tax Court
1942 Tax Ct. Memo LEXIS 2; 1 T.C.M. (CCH) 349; T.C.M. (RIA) 42681; 12/31/1942
*2 H. A. Mihills, C.P.A., 917 Munsey Bldg., Washington, D.C., for the petitioner. Z. N. Diamond, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined income tax deficiencies of $2,300.09 for 1938 and $2,024.14 for 1939. Petitioner assails the depletion and depreciation bases of assets acquired by merger. Findings of Fact Petitioner, a Delaware corporation with principal office at Buffalo, New York, was organized in 1925, and is engaged in the manufacture of gypsum and kindred building products. Its income tax returns for 1938 and 1939 were filed in the 28th District of New York. In 1934 an expansion of petitioner's business into new territories was being contemplated and its representatives began negotiations for the acquisition of the plant of Universal Gypsum and Lime Company at Rotan, Texas. Universal, a Delaware corporation organized in 1922, was also engaged in the manufacture of gypsum and kindred products and had plants in Texas, Pennsylvania, Ohio and Iowa. It had sustained heavy losses for ten years, and was in bankruptcy under section 77B. After court approval of a reorganization plan on February 4, 1935, its capital *3 stock consisted of 17,628 $60 par value preferred shares; 352,560 $1 par value Class A common shares; and 102,989 $1 par value Class B common shares. In April, 1935, Universal rejected petitioner's offer of $250,000 for the Rotan plant. Petitioner then negotiated for the acquisition of all the assets of Universal "if they could be had at some amount less than the capital par value of that Corporation, and if such acquisition could be made by payment in this Corporation's Preferred and Common Stocks without payment of cash." On June 12, 1935, petitioner proposed to Universal's directors that its shares be exchanged for all the outstanding stock of Universal on the basis of one-half preferred share of petitioner for one $100 par value preferred share of Universal and one and a half $5 par value Class A common shares of petitioner for ten common shares of Universal, Class A or B. Petitioner's offer was to become binding upon the assent of holders of 51 per cent of Universal's preferred shares and of 51 per cent of its common shares. Universal's directors resolved that the proposed exchange was "for the best interest of the stockholders" and communicated it to them. Petitioner amended *4 its charter to permit issuance of additional shares, but because of difficulties with the Securities and Exchange Commission this plan was not carried out. Negotiations were continued, and a plan for exchanges on the same basis was adopted, under which the First National Bank of Chicago agreed to act as depository for shares of Universal's assenting shareholders. To carry out the plan, petitioner's board of directors on September 5, 1935, authorized its officers to issue, within one year from August 31, 1935, not to exceed 8,814 $100 par value preferred and 68,332.35 $5 par value Class A common shares, the numbers necessary to acquire all Universal's shares upon the agreed basis of exchange. None of these two classes of shares had voting rights. On the same day, Universal's board of directors resigned and a majority of them were replaced by petitioner's men. After two reports to petitioner's board of directors on progress in the operation of Universal's properties, petitioner's president on November 26, 1935, pointed out to the board that a merger of petitioner and Universal would effect economies, and that petitioner had then acquired 87 per cent of Universal's stock and over two-thirds *5 of each class of its shares: 15,776 preferred, 322,050 Class A common, 74,178.6 Class B common. Petitioner's directors authorized a stockholders' meeting on December 26, 1935, to act upon the proposed merger, and on the same day Universal's directors did likewise. On December 26, 1935, the stockholders of both corporations ratified an "agreement of merger and consolidation" whereby Universal was merged into petitioner, ceased to exist as a separate corporation, and petitioner succeeded by the agreement and by law to "all the rights, privileges, powers and franchises * * * and all property" of each constituent corporation, and "all debts, liabilities and duties of the respective constituent corporations shall henceforth attach to said consolidated Corporation * * *". Petitioner's by-laws, directors and officers were retained; holders of its shares were to retain the same certificates and holders of Universal shares were to exchange their shares for petitioner's shares on the same basis as before provided. On December 30, 1935, the agreement was filed with the Secretary of State of Delaware, and the merger became effective. On that date, 713 preferred and 6,789.405 Class A common shares *6 of petitioner remained with the depository because Universal shareholders, whose shares would have entitled them to that number upon exchange, had not presented their shares for exchange. These shares had been issued in the name of nominees pursuant to a directors' resolution of November 26, 1935. The total number of petitioner's shares necessary for a complete exchange, as contemplated, were registered with the Securities and Exchange Commission and the Class A common shares were listed on the Chicago Stock Exchange. Petitioner's preferred shares entitled the holder to a cumulative preferred dividend of 7 per cent per annum and were subject to redemption at petitioner's option at $105. There were no accumulated unpaid dividends. The fair market value of the 8,814 preferred shares was no less than $881,400. Shares of petitioner's Class A common stock were bought and sold between August 21 and December 30, 1935, at prices ranging from $19 to $41 a share. On the basis of the market price as of the date of each of the several exchanges of them for Universal shares and the market price of the unexchanged 6,789.405 on December 27, 1935, the aggregate value of the 68,332.35 Class A shares *7 issued for exchange was $1,727,568.21. The combined value of preferred and Class A common shares so issued was $2,608,968.21. At the time of merger, Universal's assets comprised gypsum and lime deposits, land, building, machinery, equipment, inventory, patents, stocks, notes and accounts receivable, cash, and some miscellaneous items. The aggregate at which these assets were carried on Universal's books was $2,280,251.54. Exclusive of capital stock and surplus accounts, its liabilities were accounts payable of $68,660.49, and its net book value was $2,211,591.05. For 1935, it had an operating deficit of $11,660.18. On April 4, 1936, entries were made in petitioner's journal increasing the aggregate value of the assets acquired from Universal to $2,665,968.52, by writing up four groups of items with the following explanation: To give effect to acquisition of net assets of Universal G & L Co. through merger on Dec. 30, 1935 charging the excess of the cost thereof over the net book values to property, plant and equipment and to charge surplus with the loss sustained by that company during the period it operated as a subsidiary (Sept. 1 to Dec. 30, 1935). The assets written up in transferring *8 them to petitioner's books were: gypsum and lime deposits from $581,764.32 to $701,009.18; buildings from $603,351.19 to $727,020.72; machinery and equipment from $557,973.35 to $6723641.53; non-depletable land from $138,724.00 to $167,158.41. The book values of notes, accounts, inventory, stocks, patents, and miscellaneous items were not increased. At the time of the merger no inspection or detailed investigation of Universal's properties had been made for petitioner, and there was no attempt at that time or before to apportion any cost among the various assets transferred from Universal. Members of petitioner's production department had a general knowledge that many of Universal's properties were in good physical condition and petitioner's secretary arbitrarily increased book value of the above four groups of assets by $385,716.98 after consultation with them. An investigation of all Universal plants was made by the production department after acquisition as a basis for improvements. In determining petitioner's income tax for 1938 and 1939, the Commissioner computed deductions for depreciation and depletion on the properties acquired from Universal by using as bases the costs *9 of the properties to Universal. Opinion STERNHAGEN, Judge: In the determination of petitioner's income taxes for 1938 and 1939, the Commissioner disallowed as excessive $11,999.06 and $8,182.69, respectively, claimed as deductions for depletion and depreciation on undescribed properties. The bases, rates and exact character of the properties are not disclosed in the deficiency notice or in the record, but the parties agree that they were among assets acquired by merger from Universal and that in recomputing the amounts deductible the Commissioner used as bases the cost to Universal. Petitioner contends that the proper basis is cost to it and that the measure of that cost is determinable by reference to the fair market value of its 8814 preferred and 68,332.35 Class A shares which were exchanged or deposited to be exchanged for all of Universal's shares. This value has been found to be $2,608,968.21, in accordance with petitioner's contention. After adjustments for liabilities assumed and an operating loss, petitioner distributed this figure among the several groups of assets as their book value. Apparently petitioner claims these book values as the bases for depletion and depreciation *10 of the several groups of depletable and depreciable assets in controversy. As a legal proposition, petitioner acquired Universal's assets, not by an exchange of its own shares therefor, as it assumes for argument, but as a result of Universal's merger with it under the laws of Delaware. As the meaning of "reorganization" includes a statutory merger, (section 112 (g) (1) (A), I.R.C.), the assets were acquired "in connection with a reorganization" before 1936; and as petitioner owned nearly all the Universal shares, "an interest or control in such property of 50 per centum or more remained in the same persons," to-wit: petitioner's shareholders. By section 113 (a) (7)(A), I.R.C., petitioner's basis is the same as that of Universal, and hence Universal's cost must serve for computation of the amounts deductible for depreciation and depletion. Section 114 (a)(b), I.R.C. As the Commissioner used Universal's cost, his determination must be sustained. Disregarding the actual mode of acquisition, petitioner directs argument to the proposition that the exchange of its shares for Universal shares did not constitute a statutory reorganization because the shares issued in exchange by it were *11 without voting rights. As section 112 (g) (1) (B), I.R.C., defining a reorganization to include certain acquisitions of shares or property in exchange for shares requires that the transferee's shares represent voting stock, it is urged that "there is no basis whatsoever for invoking the reorganization statutes in respect to acquisition of Universal capital stock by petitioner." We need not decide the question argued, for the tax incidence of the share exchange is not germane to the issue raised. Petitioner failed in its attempts to purchase property from Universal; it then sought to acquire stock from the individual Universal shareholders. Having gained control in this manner and operated Universal's plants for several months, it then resolved to bring about the merger. The record does not support the conclusion that either in fact or by intent petitioner's shares were issued for Universal's assets. Having deliberately acquired the assets by merger, petitioner must bear the tax consequences of its election. But even if the value of shares issued for Universal shares could be treated as petitioner's cost of depletable and depreciable assets, there is nothing in the record to indicate *12 the specific assets for which new bases are sought, and neither the stipulation nor the testimony of petitioner's secretary affords any basis for an allocation of such cost among the several groups of assets which Universal owned. The aggregate value of $2,280,251.54 on Universal's books was increased on petitioner's books to $2,665,968.52. The latter figure mathematically results from the addition of Universal's liabilities ($68,660.49) to the value of petitioner's shares issued in exchange ($2,608,968.21) and the subtraction of Universal's 1935 operating deficit ($11,660.18). Thus petitioner treated the share value as cost for setting up the asset values on its books, and as its secretary testified and its balance sheet indicates, the excess of $385,716.98 was "arbitrarily" divided into four parts and added to Universal's book values for four groups; gypsum deposits, buildings, machinery and equipment, non-depletable lands. The tax statute affords no justification for this action, and there is no evidence which tends to support these figures as a proper apportionment. No investigation of the properties was made for a cost allocation, nor is it even certain that the gypsum deposits, *13 buildings, machinery and equipment constitute the assets on which the additional depletion and depreciation deductions are here claimed, although apparently the parties so assumed. Decision will be entered for the respondent.